[L. A. No. 6102. Department One.—December 29, 1919.]

In the Matter of the Estate of PATRICK J. HAMILTON, Deceased. MARTHA HOLMES, Appellant, v. WILLIAM J. WALSH, etc., Respondent.

[1] ESTATES OF DECEASED PERSONS—CHARITABLE BEQUESTS—ABATEMENT AS BETWEEN RESIDUARY LEGACY AND SPECIFIC BEQUESTS.— Section 1313 of the Civil Code does not make wholly void gifts to charitable organizations or upon charitable trusts when their aggregate exceeds one-third of the testator's estate, but merely requires that upon distribution their aggregate be reduced to the legal limit. In making such reduction the residuary legacy, if it

be of the partially prescribed character, must give way to the specific bequests which are of the same character, so that there is permitted for distribution under the residuary legacy only the amount by which one-third of the testator's distributable estate exceeds the amount of specific bequests to charitable organizations or upon charitable trusts.

[2] ID.—BEQUEST FOR MASSES—DETERMINATION OF NATURE—EVIDENCE —CHARACTER AND OBJECTS OF MASS.—In determining whether a bequest to an archbishop of the Roman Catholic Church for masses to be said for the repose of the soul of the testator is a bequest for charitable uses within the meaning of section 1313 of the Civil Code, testimony as to the character and objects of the ceremonial of the mass according to the doctrine of the church, and also as to the rule of the church as to money paid for masses, is material.

[3] ID.—BEQUEST TO PRIEST FOR MASSES—PRECATORY TRUST NOT CREATED.—A bequest of money direct to the priest of a certain Roman Catholic Church for masses for the repose of the soul of a named person, does not create a precatory trust, as under the rules of the church the money goes to the priest individually and not to the church.

[4] ID.—BEQUEST TO ARCHBISHOP FOR MASSES—PRECATORY TRUST.— A bequest of money to an archbishop of the Roman Catholic Church with request that masses be offered for the repose of the soul of the testator and certain relatives in particular churches within his jurisdiction, creates a precatory trust, as the obligation of the archbishop, assuming that the testator intended one, is one as to the disposition and use of the money given him.

[5] ID.—PRECATORY TRUST—WORDS OF FAVOR OR PETITION.—Words of favor or petition in a will will not be raised into words of positive direction so as to create a precatory trust unless it is clear that they were so used by the testator.

[6] ID.—PRECATORY TRUST—INTENT OF TESTATOR.—In determining whether a bequest creates a precatory trust the question is whether the legatee is the beneficiary or merely a trustee for others of the gift bestowed upon him; whether the wish or desire or recommendation that is expressed by the testator is meant to govern the conduct of the party to whom it is addressed, or whether it is merely an indication of that which he thinks would be a reasonable exercise of the discretion of that party, leaving it, however, to the party to exercise his own discretion.

[7] ID.—CREATION OF PRECATORY TRUST—OBLIGATION IMPOSED—ENFORCEMENT BY COURTS NOT ESSENTIAL.—It is not necessary in order to create a precatory trust that it appear that the testator intended that the obligation imposed should be one enforceable by the courts, and in the absence of anything indicating an intention on the testator's part that it should so be enforced, it is sufficient if it appear that the testator did intend to place upon the legatee an

obligation as to whose performance the latter has no discretion, and which he cannot fail to perform in good conscience and in good faith toward the testator.

[8] ID.—BEQUEST FOR MASSES—CHARITABLE USE.—A, bequest in trust for masses to be said for the repose of the soul of the testator is a trust for charitable uses within the meaning of section 1313 of the Civil Code.

[9] ID.—CONSTRUCTION OF SECTION 1313, CIVIL CODE.—Section 1313 of the Civil Code provides no limitation upon gifts in general for charitable purposes, but places such limitation only upon gifts to charitable corporations or societies or in trust for charitable uses.

APPEAL from a decree of partial distribution of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Reversed.

The facts are stated in the opinion of the court.

Jeremiah V. Coffey, Edward I. Coffey and Edward M. Leonard for Appellant.

Willard P. Smith and Walton C. Webb, for Respondent.

OLNEY, J.—This is an appeal from a decree of partial distribution. The decedent, Patrick J. Hamilton, died testate, leaving an estate here and in Montana of the net distributable value of one hundred and twenty-one thousand dollars, or somewhat less, depending on whether or not the figures appearing in the record are the net value of the estate available for distribution, a fact which does not appear with certainty. By his will he made bequests plainly not of a charitable character in the amount of $25,450; bequests plainly of a charitable character in the amount of twenty-six thousand five hundred dollars; bequests to certain bishops of the Roman Catholic Church for masses to be said in certain churches within their jurisdictions in the amount of eight thousand five hundred dollars, and bequests to the pastors of certain Roman Catholic churches for masses to be said in their churches in the sum of three hundred, dollars. The masses to be said were in every case specified to be for the respose of the soul of the testator, or those of certain named persons, who, with one exception, were relatives of the testator, or for the souls

of the testator and relatives. The residue of his estate he disposed of by the following clause:

"Eighth: I give and bequeath all the rest, residue and remainder of my estate to the Right Reverend William J. Walsh, Archbishop of Dublin, Ireland, and I request that masses be offered for the repose of my soul, and the souls of my parents, brothers, sisters, grand parents, uncles, aunts, cousins, and all relatives, in the following named churches to wit: In the Cathedral on Marlborough Street, St. Catherine's Church on Meath Street, St. Nicholas' Church on Francis Street, St. Dominick's Church on Dominick Street, and the churches of Adam and Eve and Sts. Michael and John, all in Dublin, Ireland."

The amount of the residue so disposed of, assuming one hundred and twenty-one thousand dollars as the distributable value of the estate, is $60,250.

The archbishop of Dublin, not in his official capacity but as an individual, petitioned for partial distribution to him under the residuary clause, and this petition was opposed by one of the decedent's heirs at law on the ground that the bequest was one in trust for the saying of masses, and that such a trust was for what is known in legal parlance as a charitable use, although better described by the more general term "eleemosynary," and came within the provisions of section 1313 of the Civil Code limiting gifts of that character by will to one-third of the testator's estate. The lower court took the view that the residuary bequest was one to William J. Walsh individually without any trust, and made its decree distributing five thousand dollars to him accordingly. From this decree the opposing heir at law appeals.

It is immediately apparent from the foregoing that two questions present themselves: 1. Was the residuary bequest one to William J. Walsh for him to do with as he pleased, or was it only to him either officially or individually—it makes no difference which—upon a trust that it was to be used for the saying of masses; and, 2. If the bequest were upon such a trust, is a trust of that character a charitable trust within the meaning of the code section? If it be held that there is a trust and that it is of a charitable character, then a third question presents itself, namely, as to the char-

acter of the other and specific bequests for masses. [1]
The reason for this is that the code section does not make
wholly void gifts to charitable organizations or upon char-
itable trusts when their aggregate exceeds one-third of
the testator's estate, but merely requires that upon distribu-
tion their aggregate be reduced to the legal limit. In mak-
ing such reduction the residuary legacy, if it be of the
partially prescribed character, must give way to the specific
bequests which are of the same character (*Estate of Sloane,*
171 Cal. 248, [152 Pac. 540]), so that there is permitted for
distribution under the residuary legacy only the amount by
which one-third of the testator's distributable estate exceeds
the amount of specific bequests to charitable organizations
or upon charitable trusts. The ascertainment of this
amount, of course, requires a determination of what specific
bequests are of this character and must, therefore, be taken
into account. This means in the present case, if the
residuary legacy is found to be upon a charitable trust, a
determination of the character of the specific bequests for
masses as well.

The court in this case has the advantage of the testimony
of the chancellor of the Roman Catholic diocese of Monterey
and Los Angeles, given on behalf of the heir at law, as to
the character and objects of the ceremonial of the mass
according to the doctrine of the church, and also as to the
rule of the church as to money paid for masses. [2] This
testimony was received in the lower court and subsequently
stricken out as not material, but we conceive it to be quite
material. It is not controverted. From it two things ap-
pear which are of importance and which it is well to state
at this point. First, it appears that a mass for the repose
of the soul of one, deceased, differs but little from other
masses, and in particular differs not at all in its primary
character and objects or the primary results which in the
contemplation of the church flow from it. Every mass in
the view of the church is a sacrifice to God, the making
again of the Supreme Sacrifice upon the Cross and for the
same purpose, a sacrifice for all of mankind who will accept
it in atonement for their sins. As put by the witness, it
gives honor and glory to God; it thanks Him for all the
benefits He bestows upon the world; it makes petition to
Him for those blessings and graces which men are in need

of, and it makes atonement for His offended justice. When a mass is said for the soul of a departed individual it has also special fruit for his soul. Just the nature of this special fruit does not appear in the testimony, but from our general knowledge of the doctrine of the church we should judge that among other possible things it lies in the direct efficacy of petition to God, a belief of the church, and when the deceased is himself responsible for the mass being said, as when he has left a bequest for that purpose, in the merit or grace which inheres in the doing of a good deed. Just what the special fruit is, is, however, not important here. It is plain that every mass, whether it be a special mass for the soul of a departed one or not, is an act of worship which, according to the doctrine of the church, spiritually benefits all who participate in it and all who are willing to accept the sacrifice and atonement offered by it, that is, the faithful of the church. From its very nature it must be a most sacred and important act of worship in the ceremonial of the church, representing in fact the very essence of its faith, since in the eyes of the church it is the present repetition of the Crucifixion, which is the foundation of the church.

The second matter of importance appearing in the testimony of the chancellor is that the money paid or left for masses goes not to the church, but to the particular priest individually in whose church and by whom the masses are said. We understand that generally the priest receiving this or any other money considers himself morally obligated to apply any excess after supplying his own very limited personal needs to some worthy and unselfish purpose, such as the relief of the poor of the parish. But the money, nevertheless, is his, and he can do with it as he wishes. If he fails to apply it to worthy purposes, he is guilty of a moral delinquency, but otherwise has not broken a rule of the church.

Passing now to a consideration of the questions in the case, it is contended strongly by the residuary legatee that the words of the residuary clause "and I request that masses be offered for the repose of my soul, etc.," immediately following the words of gift were not intended by the testator to impose an obligation upon the legatee, but were addressed merely to the latter's judgment or discre-

tion, so that if he truly thought it best, he could use the money for any purpose he desired and not have masses offered as requested, and yet not violate the obligation upon which he received the gift. The contention of the heir at law is that the testator intended that the money should go for masses and for no other purpose, and that because of this a precatory trust is created.

If the intention of the testator be as contended for by the heir at law, it does not necessarily follow that a precatory trust is created. A bequest may be made and in such language as to admit of no doubt that the testator intended to impose an obligation upon the legatee and yet no trust exist. For example, a testator might make a special bequest to his oldest son and specify that it was given upon the injunction that every year on the date of his father's death the son should call his brothers and sisters together and offer up a prayer in memory of the father. The words of obligation are precise and admit of no question, and the obligation upon the son is there, and yet there is no trust. The reason is that the obligation imposed does not run to the disposition of the money or property bequeathed. The money or property is neither given nor received upon any obligation as to what shall be done with it. It is intended to be the son's and for his personal benefit. The essential element of a trust that the subject matter of the trust—the money or the property—be held by the trustee for someone else, or be used for the accomplishment of some object or objects other than the personal benefit of the trustee is absent.

Another illustration of the same thing is, we believe, the case of the bequests by the will under consideration here direct to the pastors of three certain churches of a hundred dollars each for masses for the repose of the soul of one John P. Gallagher. By the rules of the church, as we have said, these bequests belong not to the church but to the pastors personally. As to them, the essential point is that while they will receive the money upon the obligation to offer masses as required, such obligation does not go to the use or disposition of the money. Its use or disposition by the priest is not necessary in order that he offer the masses required. He receives the money not to be by him expended or used for masses, for that is not necessary, but

either as a gratuity, the view of the church, or as compensation; it makes no difference which. **[3]** In either case he receives it for himself, so that there is no trust. (*Sherman* v. *Baker*, 20 R. I. 448, [40 L. R. A. 717, 40 Atl. 11]; *Harrison* v. *Brophy*, 59 Kan. 7, [40 L. R. A. 721, 51 Pac. 883]; *Moran* v. *Moran*, 104 Iowa, 216, [65 Am. St. Rep. 443, 39 L. R. A. 204, 73 N. W. 617].)

The question immediately arises, Is the residuary legacy of this same sort? If it is, there is no precatory trust no matter what view may be taken as to the obligatory character of the testator's request for masses which accompanies the gift. **[4]** We think it plain from the evidence, however, that the residuary legacy is not of this character, assuming that the request for masses is obligatory. The masses requested are masses to be offered in particular churches. The residuary legatee is not the pastor of those churches, and the inference is clear that the testator contemplated that the masses to be offered would be offered by the pastors of those churches in accordance with the usual custom of the church, and not by the archbishop himself. By the rules of the church these pastors are entitled to the stipend for the offering of the masses and the testator must, therefore, have contemplated and intended that the archbishop would use the legacy, not for his own benefit or as he saw fit, but for paying the stipends of the pastors in whose churches and by whom the masses were to be offered. The obligation of the archbishop, therefore, assuming that the testator intended one, was one as to the disposition and use of the money given him. This is no more than saying that it was given upon a trust, and the essential element which is lacking in a direct gift to the pastor who is to say the masses, namely, that the obligation go to the use or disposition of the subject matter of the gift, is here present.

Taking up now the question of the obligatory character of the request for masses, it is, of course, one solely as to the testator's intention. The word used, "request," is accurately one of petition or favor. Yet very frequently what is a real command or positive direction is as a matter of polite or deferential expression cast in the form of a request. **[5]** The rule is, of course, well established that words of a favor or petition in a will will not be raised into

words of positive direction so as to create a precatory trust unless it is clear that they were so used by the testator. There are numerous decisions in our own state to that effect. Is the testator's intention in the present case clear?

It is well at the outset to distinguish clearly just what the intent is which must exist in order that there be a precatory trust. It is thus stated in *Estate of Marti,* 132 Cal. 666, 669, [61 Pac. 964]:

[6] "The question for determination is, whether the devisee or legatee is the beneficiary, or merely a trustee for others, of the gift bestowed upon him; whether the wish or desire or recommendation that is expressed by the testator is meant to govern the conduct of the party to whom it is addressed, or whether it is merely an indication of that which he thinks would be a reasonable exercise of the discretion of that party, leaving it, however, to the party to exercise his own discretion."

This language has been subsequently quoted, or its substance repeated, with approval, as correctly stating the test to be applied, in *Estate of Mitchell,* 160 Cal. 618, 621, [117 Pac. 774], *Estate of Purcell,* 167 Cal. 176, 179, [138 Pac. 704], and *Estate of Browne,* 175 Cal. 361, 362, [165 Pac. 960]. That it does in fact correctly state the test admits of no doubt. Applying it here, the question is, Was the residuary legacy intended by the testator as one to "William J. Walsh, Archbishop," as himself the beneficiary with a request addressed to his discretion merely that masses be said for the soul of the testator and his relatives, or was it one to the legatee named to be applied by him to the particular purpose of having the masses said without intent that he should be at liberty in his own discretion not to so apply the gift? That this is a correct statement of the question immediately involved we do not believe can be gainsaid. So stated, the answer to the question seems to us plain. We cannot believe that the testator contemplated that William J. Walsh should personally benefit by the the gift or that the gift was made for that purpose. It seems to us plain that the gift was made to William J. Walsh, who is the archbishop of Dublin, solely in order that he, the archbishop, might see to it that masses were said in the designated churches under his jurisdiction as requested.

The words of gift and the words of request are directly and immediately coupled together in the same sentence, so that it is apparent that the gift and the requested disposition of it by the legatee ran together in the testator's mind, and there is a strong presumption at least that both were parts of a single purpose which the testator was seeking to accomplish. But if the testator intended both to benefit the legatee personally and also to have a number of masses said in the discretion of the legatee, there were two purposes and not a single one. The case comes exactly within the further language of *Estate of Marti*, where it is said (132 Cal., p. 670, [61 Pac. 965]):

"If the testator accompanies his bequest with a desire on his part that it shall be applied in a certain way, or for the benefit of another than the legatee, either by coupling the same as a directing clause in the sentence by which the bequest is made, or by specific reference thereto, there is a clear manifestation that it was his intention that such disposition should be made of the property given to the legatee. In such a case a duty or obligation towards the other is imposed upon the legatee as a consideration for the gift. His acceptance of the property is upon the condition that he will comply with the direction or request of the testator, and he will be held as a trustee for that purpose."

According to the rule of construction so stated the immediate coupling together in the same sentence of the gift and an unqualified request for its disposition in a certain manner, as was done in the will before us, alone requires the conclusion that it was the intention of the testator that the gift should be disposed of in the manner requested and is determinative upon the point of a precatory trust. Whether strictly such coupling together would alone positively require such conclusion, certainly it is a very cogent and compelling circumstance, and in the present case there are other circumstances strongly corroborative. So far as appears there was no relation or bond of any character between the testator and the legatee which would make the latter a natural object of the testator's bounty. No reason appears why the testator should have desired to benefit the legatee personally. On the other hand, if the real and final object of the testator were to provide for the saying of masses in certain churches in Dublin, no more natural selec-

tion of the person to carry out his desire could be made than that of the archbishop of Dublin, under whose care the Catholic churches of that city are.

It has been repeatedly said that the construction placed upon one instrument, or upon particular words as used in one instrument, is of little value as a precedent for the construction of another. Again referring to *Estate of Marti, supra,* it is there said that this is particularly true of cases involving the existence or nonexistence of a precatory trust, and that previous decisions only serve to illustrate the application of general rules for the construction of wills. After all, a question of construction is largely, if not finally, a matter of the impression as to the maker's intention made upon the mind of the court when it picks up and reads the instrument, reading it in the light of the circumstances under which it was made, if such circumstances appear. Picking up the present will and reading it and particularly the residuary clause, the impression is strong upon us that the testator clearly did not intend a gift in any particular or contingency for the personal benefit of William J. Walsh, but did intend solely to provide for masses and selected William J. Walsh, the archbishop of the diocese wherein the masses were to be said, as a very natural and suitable instrumentality to carry out his desire.

Our impression in this respect is not affected by the circumstances urged upon us that in preceding clauses of the will there are specific bequests "to Archbishop Walsh or his successor in office," and that such bequests are given directly "for masses for the repose of," etc., without words of request. As so put there is of course no doubt as to the testator's intention in connection with these specific bequests, and the differences of expression between them and the residuary clause are entitled to consideration and have some weight. But differences in expression of the same intent are so natural, are so inevitable in fact unless particular care is taken to avoid them, that the significance of differences in expression is not great, where, as here, the same intent may be very suitably and naturally expressed in both ways. In the present case the differences are wholly insufficient to overcome the effect of the immediate coupling together as one of the gift and the request,

the absence of any reason why the testator should desire to make the residuary legatee personally the object of his bounty, and the complete explanation of the latter's selection as legatee if the testator's real object was to have masses offered as he requests.

But, it may be said, while there does appear an intention on the part of the testator to impose an obligation upon the archbishop with relation to the gift, yet such obligation is addressed to his conscience and it does not appear that the testator intended an obligation cognizable or enforceable in law or equity. [7] The answer is that it is not necessary in order to create a trust that it appear that the testator intended that the obligation imposed should be one enforceable by the courts, and it is very rare that such intention does appear. In the vast majority of cases of precatory trusts there is nothing to indicate that the question of whether or not the obligation which he was imposing upon the legatee was enforceable by the courts ever occurred to the testator, and the extreme probabilities are that it did not. The true rule is, we believe, that in the absence of anything indicating an intention on the testator's part that it should so be enforced, it is sufficient if it appear that the testator did intend to place upon the legatee an obligation as to whose performance the latter has no discretion and which he cannot fail to perform in good conscience and in good faith toward the testator. Upon the obligation so imposed, the courts of equity, whose function is so largely that of courts of conscience, will seize and will enforce it if necessary. The exception to this is where it affirmatively appears that, while the testator did intend an obligation, he did not intend that it should be enforceable by the courts, but deliberately left the matter of its performance exclusively to the good faith of the legatee. Of this character were the wills before the court in *O'Donnell* v. *Murphy*, 17 Cal. App. 625, [120 Pac. 1076], and *Estate of Purcell*, 167 Cal. 176, [138 Pac. 704], in both of which the testatrix expressly stated that it was not her intention to place any trust or binding obligation upon the legatee. There is no comparable expression in the present will, nor anything from which the intent to impose an obligation, but deliberately to leave its performance exclusively to the

good faith of the legatee may be deduced. Upon this branch of the case our conclusion is that the residuary legacy was upon the obligation, and, since there is nothing to indicate that such obligation should not be enforceable by the courts, consequently upon the trust, that it should be applied so far as it would go to the payment of the necessary stipends for the offering of masses in the churches named by the testator.

The conclusion so reached necessitates a consideration of the question as to whether or not such a trust is one for charitable uses. This depends upon whether masses for the souls of particular decedents are charitable uses in the view of the law. If they be not charitable uses, there is a very serious question as to the validity of trusts for masses. It has been held that as private trusts, trusts for masses are entirely void because of the want of a living beneficiary. (*Holland* v. *Alcock*, 108 N. Y. 312, [2 Am. St. Rep. 420, 16 N. E. 305]; *McHugh* v. *McCole*, 97 Wis. 166, [65 Am. St. Rep. 106, 40 L. R. A. 724, 72 N. W. 631]; *Festorazzi* v. *St. Joseph's Church*, 104 Ala. 327, [53 Am. St. Rep. 48, 25 L. R. A. 360, 18 South. 394].)

On the other hand, if trusts for masses are trusts for charitable uses, then they are entitled to the favor shown by the law to charitable trusts, and to be relieved from the rules applicable to private trusts, but at the same time are necessarily subject to the limitations imposed by law upon charitable trusts in general. As to what their character is in this respect, the decisions differ, although the great weight of authority is that trusts for masses, even masses for the souls of particular decedents, are charitable trusts. (*O'Hanlon* v. *Logue*, [1906], 1 Ir. Rep. Ch. Div. 247; *Morris* v. *Edwards*, 227 N. Y. 141, [124 N. E. 724]; *Hoeffer* v. *Clogan*, 171 Ill. 462, [63 Am. St. Rep. 241, 40 L. R. A. 730, 49 N. E. 527]; *Burke* v. *Burke*, 259 Ill. 262, [102 N. E. 293]; *Rhymer's Appeal*, 93 Pa. St. 142, [39 Am. Rep. 736]; *In re O'Donnell*, 209 Pa. St. 63, [58 Atl. 120]; *Schouler, In re*, 134 Mass. 426; *Ackerman* v. *Fichter*, 179 Ind. 392, [Ann. Cas. 1915D, 1117, 46 L. R. A. (N. S.) 221, 101 N. E. 493]; *Coleman* v. *O'Leary's Exr.*, 114 Ky. 388, [70 S. W. 1068]; *Kerrigan* v. *Tabb* (N. J.), 39 Atl. 701; *Webster* v. *Sughrow*, 69 N. H. 380, [48 L. R. A. 100, 45 Atl. 139]; *In re*

*Kavanaugh's Estate,* 143 Wis. 90, [28 L. R. A. (N. S.) 470, 126 N. W. 672].)

In this state, however, it has been held that a bequest for masses for the soul of the testator was not a bequest for a charitable use. (*Estate of Lennon,* 152 Cal. 327, [125 Am. St. Rep. 58, 14 Ann. Cas. 1024, 92 Pac. 870].) The ground upon which the decision is put is that the bequest is for the benefit of the testator alone. This is purely a question of fact, a question as to the purposes and results of the mass according to the doctrine of the church, and if in the present case the evidence as to the fact is different and requires a different conclusion, effect must be given to it. In the Lennon case the court affirmed a decree where, as stated in the opinion, the record was fragmentary, uncertain, and incomplete, and presented no evidence against the rulings and decisions of the lower court. In the present case the evidence is ample and leaves no room for doubt. Whether the masses be offered for the soul of particular persons or not, it is shown, as we have said, that they are a most important and sacred act of worship according to the doctrine of the church of whose ceremonial they are a part. When offered for the souls of particular persons, they do have some special fruit individual to such persons, but their primary object and character is the same. They benefit spiritually both all who immediately participate in their celebration and also all the members of the church who by their membership and faith in the church accept the atonement offered by the sacrifice which by the doctrine of the church is made by the mass.

[8] Such being the fact in regard to the character of masses as shown by the evidence in this case, the conclusion that a bequest in trust for masses is a trust for charitable uses follows almost as of course. It is too well established to admit of question, or to require the citation of authority, that in the category of what the law calls "charitable trusts" are trusts for the furtherance of religion or for religious purposes, such as the support of a church, the support of missionaries, the inculcating of the doctrines of the church, and the performance of religious observances and acts of worship. Of this nature are masses according to the doctrine of the Roman Catholic Church, and by that doctrine they must

be judged in determining whether or not they are of a purely private character or are of general spiritual benefit.

What has already been said practically disposes of the remaining questions in the case. The specific bequests to various bishops for masses to be said in particular churches within their respective jurisdictions are, like the residuary legacy, bequests in trust since by the rules of the church the masses would be customarily offered by the priests of those churches, who would be entitled to the stipends for so doing, and it must have been the intention of the testator that the bequests should be used for the purpose of paying those stipends. They are also trusts for a charitable use. This is not true of the bequests to particular pastors for masses in their churches. As we have said, these bequests go personally to such priests for them to use as they see fit and there is no trust. [9] Section 1313 of the Civil Code, provides no limitation upon gifts in general for charitable purposes. It places such limitation only upon gifts to charitable corporations or societies or in trust for charitable uses. The bequests in this case to the pastors do not come in either of these classes. It follows that in determining the amount of the gifts made by the will, which come within the operation of the code section, there must be included the specific bequests to the various bishops for masses and excluded the bequests to the pastors.

Decree reversed for further proceedings consistent with this opinion.

Shaw, J., and Lawlor, J., concurred.

Hearing in Bank denied.

All the Justices concurred.