## Obrecht, Executor of Barthelmey Pujos v. Arthur Pujos, Edward Pujos and Marie Louise Pujos.

(Decided January 23, 1925.)

### Appeal from Nelson Circuit Court.

1. Charities—Bequest for Celebration of "Masses" for Testator Held a "Charitable Use."—A bequest to be applied for masses to be celebrated for testator is for a religious purpose general to the public in its nature, and is a "charitable use" within Ky. Stats., section 317; "mass" being defined as "the service or liturgy of the Eucharist, a celebration of the holy communion," and being a public service of God, a public worship at which the holy communion is celebrated.

2. Charities—Trust for Charitable Purposes Does Not Fail for Want of Trustee.—A bequest to be applied for masses to be celebrated for testator, being for a charitable use within Ky. Stats., section 317, fact that no trustee or donee was named will not cause bequest to fail, under section 318.

3. Charities—Bequest for Celebration of Masses for Testator Held Not to Fail Because no Beneficiary Designated.—A bequest to be applied for masses to be celebrated for testator will not fail because no beneficiary was designated, since testator undoubtedly intended that masses should be said in some Roman Catholic church, and general class of use being designated with reasonable

certainty, immediate object thereof may be selected by trustee, and if trustee appointed should fail to execute wish, he may be called to account.

4. Charities—Bequest for Charitable Purpose Held Not to Fail Because no Trustee Designated.—A bequest of residue of testator's estate to be devoted exclusively to reconstruction of monasteries destroyed by present war and relief of poor ones will not fail because no trustee or donee was named, under Ky. Stats., section 318.

5. Charities—Bequest for Reconstruction of Monasteries and Relief of Poor One Held for a "Charitable Use."—A bequest to be devoted to reconstruction of monasteries destroyed by war and relief of poor ones, held for "charitable use," within Ky. Stats., section 317.

6. Charities—Bequest for Reconstruction of Monasteries Held to Designate Beneficiary with Reasonable Certainty.—Bequest made in 1918 to be devoted to reconstruction of monasteries destroyed by "present war" and relief of poor ones, testator undoubtedly meaning monasteries of Roman Catholic faith, held to point out beneficiary with reasonable certainty, and sufficiently specific to satisfy requirements of statutes, and immediate objects of such provision may be designated by trustee when appointed.

FRANK E. DAUGHERTY and JOHN FULTON for appellant.

JONES, HOCKER, SULLIVAN & ANGERT & OSSO W. STANLEY for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing on the original appeal and affirming on the cross-appeal.

This appeal involves the validity of the first and third clauses of the following will:

"Trappist Monastery.        Jan. 9, 1918.

"My last will and testament in case of sudden death before the end of my novitiate in the order of Reformed Cistercians.

"To the authority of the Monastery.

"It is my last will and testament that the following sums be applied as follows out of the fund brought and left by me to the Rev. Father Abbot:

"1st.   Three hundred dollars ($300.00) to be applied for masses to be celebrated for the repose of my soul after my decease.

"2nd.   Two hundred dollars ($200.00) for a special intention especially recommended.

"3rd.   Three thousand dollars ($3,000.00) to be sent to my niece left an orphan of father and

mother, almost penniless and at the mercy of a wicked world. This sum to be forwarded to the City and District Savings Bank, Rachel and St. Dennis sts., Montreal, to be entered into her account and unknown to her mother-in-law, the receipt of said sum to be acknowledged by bank manager. The balance of the money left in the care of Rev. Father Abbot to be devoted (as suggested by him at my arrival) exclusively to the reconstruction of monasteries destroyed by the present war and the relief of poor ones.

"I also beg God's blessings on the faithful executor of this my last will and testament.

"B. Pujos."

The testator, a British subject of French extraction, was a novice in the Trappist Monastery at Gethsemane in Nelson county. When he entered the monastery he deposited with the appellant, who was then and is now the abbot of that monastery, cash and securities to be held subject to his order. Before he took his final vows as a monk he died and some time thereafter the above will was discovered and probated, the appellant being appointed administrator *cum testamento annexo*.

The appellees, who are the heirs at law of the testator, contend in this suit that the first clause of the will and so much of the third clause as bequeaths the residue of his estate for "the reconstruction of monasteries destroyed by the present war and the relief of poor ones," are invalid. The lower court so adjudged as to the third clause but upheld the first clause. The appellant appeals from that part of the judgment denying the validity of the contested part of the third clause, and the appellees prosecute a cross-appeal from that part upholding the validity of the first clause.

So far as the cross-appeal is concerned, the appellees insist that the first clause of the will is void, because, first, it is not a charitable use within the meaning of our statute; secondly, there is no trustee appointed to carry out the bequest; and thirdly, since no beneficiary is designated and this is a private trust, it is invalid for the want of a beneficiary to enforce it.

In the case of Coleman v. O'Leary's Executor, 114 Ky. 399, the following bequests were upheld as valid: "I give and bequeath to the Right Reverend James M. Hayes, S. J., Chicago, Illinois, the sum of $3,000.00 for

masses for the repose of the souls of my mother and my aunts," and likewise "I direct my executor to expend the sum of $1,000.00 for masses for the repose of my soul . . . to be said at the Cathedral, Louisville." This court in that opinion pointed out that the old English cases which denounced such bequests as void on the grounds of being devoted to superstitious uses were not authority in this country where all forms of religious worship are tolerated so long as the public peace is not disturbed. In this connection it may be noted that even the English courts have departed from the old rule, and in the case of Bourne v. Keane (1919) A. C. 815, the House of Lords upheld a bequest to certain Jesuit Fathers for masses. The O'Leary case laid down the rule that the validity of such a bequest is to be tested by the same principles that would be applied to a devise in aid of the religious observances, of any other denomination. In Webster's New International Dictionary (1925), the mass is defined as: "The service or liturgy of the Eucharist; a celebration of the Holy Communion." In other words, it is a public service of God, a public worship at which the Holy Communion is celebrated. According to the tenets of the Roman Catholic Church, the celebration of the mass not only benefits the souls of the departed but also assists the souls of the living who are present and participate in the mass. From a liturgical point of view, every mass is practically the same. It is an act of public worship which, however, may have attached to it a special purpose which merely adds a particular remembrance to the mass but does not change the character of the service or convert it from an act of public worship to a mere private benefit. As said in the O'Leary case, an act of public worship is certainly not deprived of that character because it is also a special memorial of some person or because during its course special prayers are also said for some particular person. Section 317 of our statutes, being our statute defining charitable uses, reads:

> "All grants, conveyances, devises, gifts, appointments and assignments heretofore made, or which shall be hereafter made, in due form of law, of any lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money, stock, or choses in action, for the relief or benefit of aged or impotent and poor people, sick and maimed soldiers

and mariners, schools of learning, seminaries, colleges, universities, navigation, bridges, ports, havens, causeways, public highways, churches, houses of correction, hospitals, asylums, idiots, lunatics, deaf and dumb persons, the blind, or in aid of young tradesmen orphans, or for the redemption of prisoners or captives, setting out of soldiers, or for any other charitable or humane purpose, shall be valid, if the grant, conveyance, devise, gift, appointment or assignment shall point out, with reasonable certainty, the purposes of the charity and the beneficiaries thereof, except as hereinafter restricted.''

Both before and since the enactment of the statute of 43 Elizabeth, after which our statute is modeled, it has been the rule that a gift for religious purposes is one for a charitable purpose. Greer, et al. v. Synod, Southern Presbyterian Church in Kentucky, 150 Ky. 155, 150 S. W. 16; Miller v. Tatum, et al., 181 Ky. 490, 205 S. W. 557. The mass, as we have seen, being an act of public worship, is a religious purpose general to the public in its nature, and hence is a charitable use within the meaning of our statutes.

Moreover, the fact that in the case at bar no trustee or donee was named to carry out the wishes of the testator will not cause the bequest to fail. Not only by section 318 of our statutes, but also under the general principles of equity jurisprudence, no trust for charitable purposes or otherwise ever fails for the want of a trustee.

Lastly, the appellees' insistence that this bequest must fail because no beneficiary is designated is also without merit. The idea that a gift on trust for benevolent purposes might be void because there was no *cestui* to enforce the trust originated in Lord Eldon's holding in the case of Morice v. The Bishop of Durham, 10 Ves. 521. As stated by the writer in 11 Harvard Law Review, 331, this decision of this eminent judge has had a lamentable effect and has placed a great tax on the ingenuity of judges and lawyers to prevent the extension of its principle. Gifts on trust for the purpose of erecting tombstones, for maintaining stables and kennels have been upheld; see Ford, et al. v. Ford, Exor., 91 Ky. 572, 16 S. W. 451; and the principle on which these cases are supported is that the trustee or donee takes subject to a moral obligation to carry out the testator's commands, and if he is willing to act honestly equity will not prevent

him, but if he refuses to perform his duty, the heir or next of kin may interfere. As said in the O'Leary case: "Nor do we see any reason why the application of the fund to the designated purpose may not be enforced by the courts upon the application of the heir." It cannot be doubted that the testator here intended that the masses for his soul should be said in some Roman Catholic church, and if the administrator or trustee appointed should fail to execute this wish, he can be called to account in the fashion indicated. The general class of the use being designated with reasonable certainty, the immediate object thereof may be selected by the trustee. Miller v. Tatum, *supra*. We cannot essentially distinguish this provision of the will from the like clauses upheld in the O'Leary case. See also Schouler, Petitioner, 134 Mass. 426; Moran v. Moran, 73 N. W. 617 (Iowa); 39 L. R. A. 204, and the note to Hadley v. Forsee, 14 L. R. A. (N. S.) 96. For these reasons. we concur in the finding of the lower court that this first clause of the will is valid.

This brings us now to a consideration of the third clause of this will providing that the residue of the testator's estate shall be devoted exclusively "to the reconstruction of monasteries destroyed by the present war and the relief of poor ones." What has heretofore been said concerning the failure of the testator to nominate a trustee to carry out his wishes is applicable here, so that the only questions which confront us are whether or not the uses provided for by this clause come within our statute on charities above set out, and if so, are they designated with the reasonable certainty required by that statute? It is first insisted by appellees that a monastery is an institution for a privileged and restricted class of individuals and is not of a public nature; that therefore this trust is for a private charity and is too indefinite and uncertain to be sustained.

The older monasteries were divided into two general classes, known as abbeys, presided over by an abbot, and priories, governed by a prior, who was in turn subject, in most of the monastic orders, to the abbot. In the military orders, the monasteries were known as commanderies and preceptories. The abbeys always included a church and the English word "minster," still applied to churches which are no longer a part of monastic establishments, had its origin in the same Latin root as that

of monasteries.  Westminster Abbey of England may be cited as an example.  Monastic orders of the Roman Catholic Church were early established, and during the dark and middle ages performed a great public service in society.  They afforded a place of refuge and asylum for the oppressed, and the person who could gain shelter of their sanctuaries was secure from the hand of the ruling power often raised in those rude ages for the purpose of revenge and oppression.  The monasteries also performed the function of inns in those times and there the weary travelers found not only rest and refreshment, but also protection from the roving bands which infested the roads and countryside.  The Hospice of St. Bernard in the Alps is a famous example of this side of monastic work.  In them, too, the light of learning was kept burning, and the treasures of intellectual Rome and Greece were safely guarded until intellectual society once more emerged from the engulfing darkness of the barbarian invasions that followed the fall of Imperial Rome. The finer arts were also nourished and protected by the monasteries.  Sculpture, paintings and the illustration of manuscripts may be noted. With the coming of the Renaissance, a great deal of the activities of the monasteries as thus outlined became somewhat circumscribed and even ceased, but even to this day the monasteries continue to have churches connected with them in which religious services and public worship are held, and in them are educated teachers and missionaries.  The Austrian monk, Mendel, the discoverer of the great law of heredity which bears his name and which has done so much for the breeder of plants and animals, may be mentioned in this connection. The Cistercian order, founded by St. Stephen Harding, an Englishman living in France, and to which the testator belonged, sends missionaries over the world and particularly to China, where by precept and example they are striving to raise the standard of living among those people, not only in a spiritual, but also in a temporal way. Whether or not the belief of any individual coincides with that of these monastic brethren or he can approve of their theory of spiritual regeneration, yet, nevertheless, the softening influence of tolerance which pervades this country and the quickening spirit of religious freedom which characterizes our society compel the admission that monasteries which not only conduct religious services and public worship, but are also the nur-

series for priests, teachers and missionaries, come within the meaning of charitable uses as defined by section 317 of our statutes. The case of Bailey v. Waddy, 195 Ky. 415, 243 S. W. 21, confirms this view. There a provision in a will providing for the foundation of a professorship in a Tennessee sectarian institution and hedging the teaching of said professorship about with certain religious beliefs, was upheld as a charitable use under section 317 of the statutes.

Appellees next urge that this bequest is void because it does not point out the beneficiaries with reasonable certainty. That the testator meant monasteries of the Roman Catholic faith cannot be disputed. And, under our decisions, we hold that the designation of "monasteries destroyed by the present war (i. e., the late world war) and the relief of poor ones" is sufficiently specific to satisfy the requirement of our statutes. Illustrating this idea of "certainty" the following devises have been held sufficient: "For the use of a public seminary." Curling's Admr. v. Curling's Heirs, 8 Dana 38. "For the benefit of the Roman Catholic charitable institutions in this diocese." Tichenor v. Brewer, 98 Ky. 349. "To be distributed 'to the poor in his discretion.'" Thompson's Executor v. Brown, 116 Ky. 102. "To such charitable and benevolent institutions as may appear to be most useful in disseminating the gospel at home and abroad." Attorney General v. Wallace's Devisees, 7 B. Monroe 611. "Similar charitable or educational institutions (to certain ones designated) in Louisville." Gill's Executor v. Woman's Club of Louisville, 205 Ky. 731, 266 S. W. 378. "To assist aged unmarried women, preferably teachers, so that their last days may not be made miserable by extreme poverty." State Bank and Trust Company, Executor v. Patridge, 198 Ky. 403, 248 S. W. 1056. And see generally the note in 22 A. L. R. 697. In Miller v. Tatum, supra, this court said that it is necessarily uncertain and indeterminate who the ultimate beneficiaries of a charitable trust are to be. They cannot be named or located in advance. "If the class of beneficiaries be named in general language, leaving to the trustee the discretion of selecting the immediate objects of the classes named to be the actual beneficiaries, the trust is sufficiently certain." In the instant case, the class of beneficiaries is reasonably certain, and as the trust cannot fail for want of a trustee, the immedate ob-

jects of the charitable provision may be designated by such trustee when appointed. Hence we conclude that the contested part of the third clause of the will was likewise not invalid.

For the reasons stated, the judgment of the lower court on the cross-appeal is affirmed and on the original appeal is reversed.

Reversed on the original appeal and affirmed on the cross-appeal.

Judge McCandless not sitting.